## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

GWO-TZONG (PHIL) HWANG,

     Plaintiff,

     v.

XAVIER BECERRA, *Secretary,*
*U.S. Department of Health and Human Services,*

     Defendant.

Civil Action No. TDC-20-1025

## MEMORANDUM OPINION

Plaintiff Gwo-Tzong (Phil) Hwang filed this civil action against the United States Secretary of Health and Human Services ("HHS") in which he has alleged that he was subjected to race and sex discrimination, a hostile work environment, and unlawful retaliation, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e-17 (2018), and age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–634 (2018), while working at the National Institutes of Health ("NIH"), a component agency of the United States Department of Health and Human Services. Pending before the Court is HHS's Motion for Summary Judgment, which is fully briefed. Having reviewed the submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, the Motion will be GRANTED IN PART and DENIED IN PART.

## BACKGROUND

### I.    NIH Employment

Hwang, an Asian American man born in Taiwan who was approximately 58 years old at the time of the events at issue, has worked since 2008 as a Systems Accountant at the General

Schedule-14 ("GS-14") level in an office known as NIH Business System ("NBS").  At NBS, Hwang's first-level supervisor was Carol Perrone, GS-15, the NBS Director for Operations and Maintenance, who identifies as a West Indian woman.  Hwang's second-level supervisor was Charles Singleton, GS-15, the Director of NBS, who identifies as a white male.

According to Hwang, numerous Equal Employment Opportunity ("EEO") complaints have been filed against Perrone, including two other complaints filed by Asian American employees and one by a white male employee.  He asserts that in a 2012 EEO complaint filed by a Vietnamese employee, a United States Equal Employment Opportunity Commission ("EEOC") administrative judge found in favor of the employee.

In May 2016, Perrone hired Sophia Ferrer, who is female and identifies as Black, into the role of a GS-14 Systems Accountant at NBS.  Ferrer's role was the General Ledger Lead.  Ferrer was not a formal supervisor, but because all areas of accounting affect the general ledger, Perrone told several Systems Accountants that they were to report to and coordinate their activities with Ferrer.  On December 5, 2016, Perrone posted an opening for the position of Systems Accountant (Leader), but the position remained open for applications for only two days.  Although multiple Systems Accountants applied for the position, Ferrer was selected.   According to Hwang, the position was open for such a short period of time that he could not prepare and submit an application.

## A.    Initial EEO Activity

On December 20, 2016, Hwang and two other NBS System Accountants, Michael Snyder and Samba Vedula, met with the NIH Civil Program Office to report that Ferrer had engaged in bullying and workplace violence in the office to which Hwang was a witness.  In January or February 2017, Hwang provided an affidavit in support of an EEO complaint filed by Snyder.

2

### B.    2016 PMAP Rating

On February 13, 2017, Hwang received from Perrone his 2016 HHS Employee Performance Plan under the Performance Management Appraisal Program ("PMAP"). Hwang's overall rating for 2016 was a 3.00. This rating represented a reduction from his 2015 PMAP, on which Hwang had received a 3.4 overall rating. According to Perrone, Hwang received this rating because he performed "his normal daily activities" but he did not do anything "outside of his day-to-day activities" or "go above and beyond." Joint Appendix ("J.A.") 59, ECF No. 46. Specifically, she asserted that Hwang "concentrates on the simple tasks and passes over to the contractor staff the more complex issues/tasks." *Id.*

According to Hwang, although the "PMAP system is intended to award good work performance," Perrone instead used PMAP scores "for her basis of annual monetary awards" and thus "use[d] this system as a fund to award federal staff" who meet her "biased" preferences. J.A. 75. As an example, Hwang references Paul Hammond, a white male who is younger than Hwang, who received a score of 4.6 on his 2016 performance review and a "significant monetary award bonus that is more than twice of his 2015 cash reward." J.A. 76. Hammond told Hwang that he worked with "the same effort" as he had the year before and was surprised when he received his score. J.A. 76. Hwang has never received a PMAP score above 4.0.

### C.    2017 PMAP Goals

In the same time frame, Hwang received his 2017 PMAP evaluation form. Although Hwang has asserted that it contained 27 critical elements upon which he would be rated, as compared to two critical elements on the 2016 PMAP evaluation form, a comparison of the two forms shows that the 2017 PMAP form contained four formal elements—(1) Administrative Requirements, (2) Support Trans-Agency and Corporate NIH Initiatives, (3) Promote Data Driven

3

Decision Making, and (4) Improve Service of Management Functions—while the 2016 PMAP form contained the same four elements as well as a fifth element entitled NBS Administrative Requirements. However, the elements each contained a certain number of check boxes and bullet points describing activities or goals on which the rating for the critical element would be based, and the 2017 PMAP form had approximately 20 additional bullet points in total. According to Hwang, this change was "unreasonable and unrealistic" because it required him to "know almost everything," with the result that a supervisor could retaliate against "targeted staff" for not completing all of the requirements. J.A. 79–80, 203; *compare* J.A. 163–74 *with* JA 206–218. Perrone, however, has asserted that these bullet points were added to provide more clarity about what employees need to do and know, and that the same changes were made to the 2017 PMAPs for all NBS staff members.

### D.     April 18, 2017 Incident

On April 18, 2017, Perrone messaged Hwang at 3:01 p.m. and stated that "we have been trying to reach you all afternoon and have not been able to" and asked "are you working?" J.A. 95, 775. Within 15 minutes, Hwang replied and stated that he had been in contact with a contractor since his lunch break and asked what Perrone needed. Perrone responded that the contractor had been trying to reach Hwang, but since he was "unavailable," the contractor had to work with Ferrer to address the issue. J.A. 105. Perrone asserted that Hwang contacted the contractor "maybe an hour after he tried to reach [Hwang]," and that when she tried to reach him on instant messaging, his status showed as "not available for more than an hour." J.A. 105. Accordingly, she advised Hwang that "[w]hen teleworking, you need to be readily available to work on issues that arise," and that Hwang must inform her in advance if he will be away for an extended period. J.A. 105. Hwang responded by sending Perrone a list of what he did while working that afternoon to dispute

4

her accusation that he had not been working.  Because of the stress caused by this incident, Hwang was unable to sleep the night of April 18, 2017.

### E.    FBIS Access

On April 19, 2017, Hwang received a request from the Director of the Division of Risk Management and Audit Liaison for a particular set of data and other information that was needed by April 21, 2017.  After identifying the Financial Business Intelligence System ("FBIS")  as a way to fulfill the request, Hwang asked Perrone that same day to provide him with access to FBIS. Perrone responded the next day by stating that she did not believe that he could obtain the data through FBIS and declining to provide access.  According to Hwang, however, FBIS did have the requested information, and he was the only Systems Accountant who did not have access to FBIS.

### F.    EEO Complaint

On March 15, 2017, Hwang contacted an EEO official about his own claim that he had been subjected to discrimination by Perrone and received a Notice of Right to File a Formal Complaint dated April 12, 2017.  On April 27, 2017, Hwang filed a formal complaint with NIH alleging discrimination based on race, national origin, sex, and age, as well as unlawful retaliation. Among Hwang's allegations were that the limited posting of the Systems Accountant (Leader) position on December 5, 2017 did not allow him sufficient opportunity to apply for the position. He also alleged discrimination based on his lower performance rating on the 2016 PMAP and the fact that Perrone had never given him a performance rating higher than 4.0; the increase in the number of critical elements on the 2017 PMAP evaluation form; and the April 18, 2017 and April 19, 2017 incidents described above.

### G.      July 7, 2017 Incident

Between June 29, 2017 and July 17, 2017, Perrone was out of the office, and Singleton was acting in her capacity. On Friday, July 7, 2017, Hwang left the office around 3:30 p.m., before his scheduled work day ended at 4:00 p.m., because he had a medical condition that required him to go to an emergency room. According to Hwang, he had not requested to work overtime that day and had not been instructed to do so. Around 5:30 p.m. that day, Singleton went to Hwang's office to find him because he believed that Hwang had a project that needed to be completed that day and the person with whom he was supposed to be working could not get in touch with him. Singleton also called Hwang's listed cell phone and home phone numbers but was unable to reach him.

When Hwang returned to work on Monday, July 10, 2017, he requested sick leave for having left early on Friday. Because Perrone was on leave, the request went to Singleton. Meanwhile, Singleton emailed Hwang to ask why he left the office early. Hwang told him that he had felt disoriented, experienced panic, and had tightness of the chest, so he believed he was having a medical emergency. According to Hwang, Singleton denied his sick leave request because he said that he did not believe Hwang's explanation and told him, "I did not see an ambulance." J.A. 242. He told Hwang that he should inform others before leaving the office under all circumstances.

According to Singleton, Hwang had high priority work that needed to be completed that day but left without notifying anyone. Singleton has denied referencing the lack of an ambulance but has stated that if Hwang was as ill as he described, he should have called 911. J.A. 264. On August 22, 2017, Singleton issued an Official Letter of Warning for Hwang's "failure to follow the NBS Leave, Attendance, and Telework Policy" based on this incident. J.A. 270–72.

6

**H.      July 11, 2017**

On July 11, 2017, Hwang received a phone call at 3:30 p.m. and stayed beyond the end of his regular work day to address the caller's needs. With the July 7, 2017 incident in mind, Hwang emailed Singleton at 4:39 p.m. to request approval for overtime. Though he did not hear back from Singleton, Hwang continued working until 6:00 p.m., at which point he emailed Singleton that he had completed work for the day. In the following days, Hwang asked Singleton how to submit his overtime request, but Singleton told Hwang that he had not pre-approved the request and ultimately did not allow Hwang to submit a request after the fact.

According to Singleton, he does not recall any conversation with Hwang about this request but asserts that the NBS policy generally requires overtime requests to be submitted and approved before the overtime is performed.

**I.      Sick Leave**

From September 1, 2017 to October 31, 2017, Hwang was on leave from NBS for medical reasons. Although Hwang intended for the leave to be classified as sick leave, Perrone changed it to Family and Medical Leave Act ("FMLA") leave without his consent. According to Perrone, management believed that Hwang was intending to invoke FMLA leave. Indeed, on October 24, 2017, Hwang emailed an Administrative Officer asking about the status of his FMLA application. On October 26, 2017, Perrone sent Hwang a memorandum notifying him of his approval for FMLA leave. On October 30, 2017, Hwang emailed Perrone to state that he did not want to use FMLA leave, and Perrone rescinded her memorandum that same day. Still, Hwang's time records showed FMLA leave until December 2017, when a correction was finally made.

7

### J.      Risk 510

In December 2017, Perrone assigned Hwang to a project known as Risk 510, a high priority task related to findings from an audit of NIH.  Hwang was assigned to modify or replace the front-end data entry tool, which was used to upload NIH budget numbers.  According to Hwang, when he was assigned the project, he was not "provided with a clearly defined written scope/requirements." J.A. 616.  Moreover, the implementation of the "parent task" for Risk 510 was postponed until 2019, and analysis of the requirements for certain changes to the system had not yet been finalized, but Perrone instructed him prematurely to begin his analysis and complete a proposal, contrary to standard practice. J.A. 617.  Perrone then criticized Hwang for not meeting deadlines or developing the right solution and sent him "many critical comments." *Id.*  Perrone also "harshly criticized" Hwang when he reached out to the NIH budget community stakeholders for input and continued to accuse him of not being able to complete the task even though Hwang had not been provided with written documentation of the changes that the parent task would cause in the system. J.A. 618.  Although Perrone has stated that Hwang was assigned to the project because he was the only federal employee with the necessary expertise to execute it, Hwang has asserted that Perrone assigned this task to him to set him up to fail and ultimately get fired.

Indeed, Ferrer has stated that during the Risk 510 meetings between Perrone, Ferrer, Hwang, and contractors, Perrone was "harsh and abrupt with her answers" to Hwang, always telling him that he was solely responsible for arranging meetings and completing the task. J.A. 292–93. According to Ferrer, "[t]here was a disconnect between what needed to be done" for Risk 510 and the information Hwang received to be able to get it done, and that Perrone "changed the expectations" and Hwang "was never able to hit the 'moving target.'" J.A. 292.  Ferrer has also stated that Perrone did not have the technical level of budget execution knowledge needed to give

8

Hwang "the level of information that he would need to bring the Risk 510 task to a successful conclusion." J.A. 292. Shortly after Hwang left NBS in August 2018, Risk 510 was closed without a viable solution.

### K.     Detail Opportunity

In early 2018, Hwang was granted an opportunity to undertake a detail, or temporary assignment, with the NIH Office of Budget ("NIH Budget"), but on March 15, 2018, Perrone refused to approve the detail opportunity. Perrone stated that the reason was that Hwang needed to work on Risk 510, that it was a high priority project, and that he was the only federal employee with the subject matter expertise to complete it. According to Ferrer, however, Perrone blocked Hwang from going on the detail and told her that she would "rather see [Hwang's] butt fired" than allow him to go on detail. J.A. 815.

### L.     Additional Incidents

On February 13, 2018, Perrone instructed Hwang to attend a mandatory meeting occurring almost one hour after the end of his scheduled work day, but he was denied overtime compensation. According to Perrone, Hwang was "never forced or instructed to attend the meeting beyond his tour of duty," and unlike some other employees, he did not request to adjust his work schedule or submit an overtime request form for that day. J.A. 332.

On March 2, 2018, the federal government was closed due to weather. Because Hwang did not have a telework agreement, he did not work from home that day. According to Hwang, Perrone directed him to use his personal leave to cover his failure to work that day. Perrone has since stated that she did so because there was a general policy that employees had to engage in telework or take leave during such weather closures, and that she inquired that day and was told

9

that Hwang would have to take leave, but she was later told that the information was incorrect. Ultimately, Hwang was not charged leave for the day.

Finally, Hwang asserts that his ability to comment on his mid-year PMAP review was blocked. On July 17, 2018, Perrone informed Hwang by email that she would enter her comments into the PMAP system to discuss with him when she returned from vacation on August 7. On August 20, 2018, Perrone emailed Hwang again stating that "[w]e need to complete you[r] mid-year review" and that they could schedule time to discuss it or he could just go into the PMAP system and sign it. J.A. 448. One week later, on August 27, 2018, Hwang emailed Perrone that he was not able to enter his comments, and Perrone directed him to another employee for assistance. That employee determined that the system was locked when Perrone electronically signed the review and then arranged for it to be unlocked that same day. Hwang was then able to leave comments.

### M.   Perrone's Statements

Ferrer has testified that as early as February 2017, Perrone told her that Hwang, Vedula, and Snyder had filed EEO complaints. Perrone stated to Ferrer that she and Singleton had discussed the complaints, which they believed to be unfounded, and agreed that they created a lot of work for Perrone and Singleton. At some point in 2018, she told Ferrer and Singleton that since Vedula and Hwang had decided to file EEO complaints, she was going to "fight back" and "make it difficult for them" so "hopefully they'll leave" NBS. J.A. 819. She made the same or similar statements in Ferrer's presence on approximately five occasions, often in the presence of Singleton, including that she was "going to ensure that they weren't comfortable." *Id.* According to Ferrer, Perrone followed through on her statements by imposing aggressive deadlines on Vedula and Hwang and broadening the scope of their assignments on purpose. Perrone also specifically

10

told Ferrer to give Vedula tasks with short timelines for completion to set him up to fail, then she berated Vedula in front of others for not completing the work successfully. At Perrone's direction, Ferrer took similar actions against Hwang, and Perrone also berated him in meetings for not accomplishing the work, to a lesser degree than with Vedula.

Risk 510 was one of the projects for which Perrone changed her expectations, which prevented Hwang from ever being able to hit her "moving target," and she was "generally harsh and abrupt in her answers" to Hwang during Risk 510 meetings. J.A. 292. For example, in email sent to Hwang on Thursday, March 8, 2018 at 6:59 p.m., Perrone stated that Hwang had "not been able to demonstrate to the . . . team an acceptable, compliant solution" for the Risk 510 project, that after working at NBS for several years he "should be very familiar with the NBS processes, procedures, and protocols," that his "behavior to disregard instructions, procedures, and protocol will not be tolerated," and that he was required to complete the assigned task by the following Monday, March 12. J.A. 407. Likewise, on Friday, March 16, 2018 at 8:02 p.m., Perrone emailed Hwang to request certain documentation by the close of business on Monday and stated that this was the third time where Hwang was "unable to first articulate the current solution and subsequently, show the solution you are proposing," that Hwang had been in his role for at least six years but did "not know . . . a key part of your function," and that he was asking questions of the contractor when he should know the answers or research them himself. J.A. 422. When Hwang provided what he believed to be the requested material on time, Perrone responded in an email on Tuesday, March 20, 2018 at 10:52 p.m. by stating that "[o]nce again, you failed to follow directions," stating that the work he provided was repetitive and incorrect, and questioning whether he was capable of completing the task. J.A. 421. On Wednesday, March 28, 2018 at 6:06 p.m., Perrone again emailed Hwang to admonish his failure to complete the assignment and stated that

11

his "statement shows a lack of understanding of the task assigned" to him, that someone at his level and position should be able to understand the task, and that his work "so far is unacceptable for an individual at the GS-14 level." J.A. 417–19. Perrone advised Hwang in that email that his task must be completed by close of business the following Tuesday, with "no further extension." J.A. 417.

Based on Perrone's actions and statements to Ferrer that she wished Vedula and Hwang "would find somewhere else to work," Ferrer concluded that Perrone was trying to put pressure on Vedula and Hwang so that they would not want to work at NBS anymore. J.A. 818. Ultimately, Ferrer believed that Hwang "did what he was supposed to do in support of budget execution for the user community" and that he was discriminated against because of his race and national origin. J.A. 292–93. In support of this view, Ferrer stated that Perrone told him at various times that she could not understand Hwang when he spoke.

## II.    Procedural History

On August 31, 2018, Hwang left NBS and transferred to a position with the United States Coast Guard. As to Hwang's EEO complaint, on June 27, 2019, an EEOC administrative judge issued a decision adverse to Hwang. On January 22, 2020, HHS issued a Final Agency Decision in which it concluded that Hwang was not discriminated against as claimed.

On April 20, 2020, Hwang filed a timely Complaint in this Court. In his First Amended Complaint ("the Complaint"), Hwang asserts four causes of action in the following numbered counts (1) a claim of race and sex discrimination under Title VII; (2) a claim of a hostile work environment under Title VII; (3) a claim of retaliation under Title VII; and (4) a claim of age discrimination under the ADEA.

## DISCUSSION

In its Motion for Summary Judgment, HHS argues that based on the record evidence, Hwang cannot establish a *prima facie* case of discrimination or retaliation under Title VII for most of his claims because they are not based on adverse employment actions against him and he cannot identify a similarly situated comparator.  Even if he could establish a *prima facie* case, HHS argues that Hwang ultimately cannot establish that HHS's legitimate, non-discriminatory and non-retaliatory reasons for any adverse actions against him were pretextual.  HHS also argues that there is insufficient evidence to support a claim of a hostile work environment.

## I.     Legal Standard

Under Federal Rule of Civil Procedure 56, the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  The Court may rely only on facts supported in the record, not simply assertions in the pleadings.  *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at 248.  A dispute of material fact is "genuine" only if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party.  *Id.* at 248–49.

## II.     Discrimination

Hwang alleges race and sex discrimination under Title VII and age discrimination under the ADEA based on numerous incidents during 2017 and 2018, including (1) preventing Hwang from applying for the Systems Accountant (Leader) position; (2) giving Hwang a lower PMAP

13

score on his 2016 evaluation; (3) increasing the number of critical elements on his 2017 PMAP; (4) falsely accusing Hwang of not working during the afternoon of April 18, 2017 and leaving early without authorization on July 7, 2017; (5) denying Hwang access to the FBIS system on April 19, 2017 so he could not fulfill his responsibilities; (6) denying Hwang's request for overtime pay when he worked late on July 7, 2017 and February 13, 2018; (7) changing Hwang's sick leave to FMLA leave without his consent in October 2017; (8) assigning Hwang to the Risk 510 project in December 2017 to set him up to fail; (9) denying Hwang's request to serve on a detail in March 2018; (10) improperly asking Hwang to use personal leave for a government closure on March 2, 2018; and (11) preventing Hwang from commenting on his mid-year review in August 2018.

Title VII provides that "[i]t shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Relatedly, the ADEA provides that "[a]ll personnel actions" affecting federal agency employees "who are at least 40 years of age . . . shall be made free from any discrimination based on age." 29 U.S.C. § 633a(a). Both statutes require a plaintiff to establish a claim through one of two methods. The plaintiff may demonstrate through either direct or circumstantial evidence that race, national origin, sex, or age "motivated the employer's adverse employment decision," or the plaintiff may proceed through the approach espoused in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004); *see Laber v. Harvey*, 438 F.3d 404, 430 (4th Cir. 2006) (holding that the *McDonnell Douglas* framework applies to ADEA claims). Under the *McDonnell Douglas* framework, the employee must first establish a *prima facie* case of discrimination. *Hill*, 354 F.3d at 285. If the employee

14

does so successfully, the burden shifts to the employer to "articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Id.* Finally, if such a showing is made, the burden shifts back to the plaintiff to prove "by a preponderance of the evidence that the employer's stated reasons were not its true reasons, but were a pretext for discrimination." *Id.*

To establish a *prima facie* claim for discrimination based on disparate treatment, a plaintiff must present facts demonstrating:  (1) the plaintiff's membership in a protected class; (2) the plaintiff's satisfactory job performance; (3) that the plaintiff was subjected to an adverse employment action; and (4) that similarly situated employees outside the protected class received more favorable treatment or that other circumstances support an inference of discrimination. *White v. BFI Waste Svcs., LLC*, 375 F.3d 288, 295 (4th Cir. 2004); *see also Carter v. Ball*, 33 F.3d 450, 458 (4th Cir. 1994).  HHS does not dispute the first and second elements, so the Court need not address those requirements.

As for the third element, "[a]n adverse employment action is a discriminatory act that 'adversely affects the terms, conditions, or benefits of the plaintiff's employment.'" *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007) (quoting *James v. Booz–Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004)).  Examples of adverse employment actions include "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion." *Boone v. Goldin*, 178 F.3d 253, 255 (4th Cir. 1999).  Such a "tangible employment action in most cases inflicts direct economic harm." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 762 (1998).  Accordingly, actions that do not cause a "decrease in compensation, job title, level of responsibility, or opportunity for promotion" ordinarily do not constitute adverse employment actions under Title VII. *Boone*, 178 F.3d at 256–257.

A review of the incidents identified by Hwang reveals that many plainly do not constitute adverse employment actions, including falsely accusing Hwang of not working on April 18, 2017; denying Hwang access to the FBIS system on April 19, 2017; and temporarily preventing Hwang from commenting on his mid-year review. In none of these instances is there sufficient evidence to support the conclusion that the incident affected Hwang's compensation or other terms, conditions, or benefits of employment. *See Holland,* 487 F.3d at 219. Likewise, changing Hwang's sick leave to FMLA leave on October 26, 2017 and asking Hwang to use personal leave on a day the government was closed on March 2, 2018 do not constitute adverse employment actions where the evidence is undisputed that both of these actions were ultimately corrected in Hwang's favor. Hwang's assignment to Risk 510 is also not an actionable adverse employment action where Hwang has never asserted—nor does the record show—that the assignment adversely affected his pay. *See Holland,* 487 F.3d at 219 (holding that a change to a new or different job assignment at the same salary level that is "less appealing to the employee" or that causes "modest stress not present in the old position" constitutes an adverse employment action only where there was a "significant detrimental effect," such as "[a] decrease in compensation, job title, level of responsibility, or opportunity for promotion" (quoting *Boone,* 178 F.3d at 256–57)). Furthermore, Hwang's failure to be promoted to the Leader position does not constitute an adverse employment action where Hwang did not actually apply for the position and therefore was not denied the position, his colleagues were able to apply for the position even though it was open for only a short time period, and he has not provided evidence to show that he would have applied for the job but for accurate knowledge that he would have been subjected to discrimination. *See Brown v. McLean,* 159 F.3d 898, 902 (4th Cir. 1998) (stating that when a plaintiff did not apply for the position in question, the failure to apply can be excused if the other elements of a *prima facie* case

are satisfied and there is a showing that the plaintiff "would have applied but for accurate knowledge of an employer's discrimination" and "would have been discriminatorily rejected had [the plaintiff] actually applied").

A few of the incidents warrant more discussion. Although Hwang argues that the decrease in his PMAP rating from 3.4 to 3.0 was discriminatory, a change in such a rating does not constitute an adverse employment action absent evidence that the change actually affected the terms and conditions of employment such as his pay or opportunities for promotion. *James v. Booz–Allen & Hamilton, Inc.*, 368 F.3d 371, 377–78 (4th Cir. 2004) (finding that a lower rating in a performance review was not an adverse employment action where there was nothing in the record to suggest that the employer used the evaluation as a basis to detrimentally alter the terms or conditions of plaintiff's employment, even where the plaintiff asserted that the evaluation took him off track for a promotion); *cf. Goble v. City of Alexandria Police Dep't*, No. 1:14-CV-813, 2015 WL 12592721, at *3 (E.D. Va. Mar. 4, 2015) (denying summary judgment to the defendant where the "record makes clear that merit increases typically follow from positive performance evaluations" and the "[p]laintiff had enjoyed both positive performance reviews and attendant merit increases in every other year of her employment"). Although Hwang has argued that another employee, Hammond, received a "big monetary award" and "comp time" for his PMAP score of 4.6, J.A. 734, Hwang has not identified evidence that such monetary benefits were generally tied to PMAP scores, or that the change in his own annual rating from 3.4 to 3.0 specifically deprived him of a bonus or other benefits. Indeed, where Hwang stated in his deposition that he had never received a cash award, including based on his 2015 PMAP score of 3.4, there is insufficient evidence to support the conclusion that the decrease in Hwang's PMAP score was an adverse employment action.

As to the alleged increase in Hwang's PMAP critical elements, "[a]dditional duties" typically do not constitute adverse employment actions unless "they are so weighty as effectively to change these basic terms of employment." *Thorn v. Sebelius*, 766 F. Supp. 2d 585, 599 (D. Md. 2011), *aff'd*, 465 F. App'x 274 (4th Cir. 2012). Here, while the number of bullet points increased, a comparison of the 2016 and 2017 PMAP critical elements reveals that the 2017 version included one less critical element, and the additional bullet points largely memorialized duties and responsibilities that were already required of employees in Hwang's position. For instance, the added items included requirements that Hwang had to complete various training programs related to workplace legal responsibilities and conduct; follow internal protocols for administrative tasks such as time keeping, documentation, and file storage; have working knowledge of various areas within the accounting area; and generally stay engaged in the job by suggesting ways to increase efficiency, collaboration, or effectiveness. Particularly where these changes to the PMAP were not unique to Hwang, the changes did not significantly alter the "basic terms of employment" and did not amount to an adverse employment action. *Id.*

As for the denial of the request for Hwang to serve a detail at NIH Budget, the denial of a detail opportunity could be an adverse employment action "if the position would have provided some tangible and objective benefit," but "the cancellation of a temporary position that might have made [a plaintiff] more competitive for a supervisory role, without more" is not enough. *Dethridge v. Esper*, No. GLR-20-606, 2021 WL 1751120, at *5–6 (D. Md. May 4, 2021) (finding that the cancellation of a detail could be an adverse employment action where the plaintiff would have received an increase in pay during a detail, thereby making its benefits "concrete, not merely 'intangible and speculative'"). Here, however, Hwang has not presented evidence that the detail to NIH Budget would have resulted in a tangible or objective benefit. To the extent that he has

18

asserted that the detail would have given him "budget-related experience," J.A. 25, and that he has since been denied jobs because he lacked such experience, such a perceived benefit is insufficiently tangible to support a finding that the denial of this detail was an adverse employment action. *See Maramark v. Spellings*, No. 06-5099, 2007 WL 2935411, at *1 (D.C. Cir. Sept. 20, 2007) (affirming a grant of summary judgment on a discrimination claim where the denial of a five-month detail that "might have allowed [the plaintiff] to secure a permanent position" was too speculative to constitute an adverse employment action); *Brookens v. Solis*, 616 F. Supp. 2d 81, 91 (D.D.C. 2009) (finding no adverse employment action where the plaintiff asserted that a detail would have "provide[d] him training, experience and promotional or advancement opportunities" because the assertions were "vague and speculative").

There are a few incidents that appear to have affected Hwang's pay, including the incidents in which Hwang allegedly was denied overtime pay for two hours of extra work on July 11, 2017 and one hour of extra work on February 13, 2018. A denial of overtime pay or compensation for extra work can constitute an adverse employment action if it could impact pay in a significant or material way and thus affect the terms and conditions of employment. *See Formella v. Brennan*, 817 F.3d 503, 511 (7th Cir. 2016) (holding that the denial of overtime or premium pay that was a "significant and expected" part of an employee's compensation may constitute an adverse employment action); *Thorn*, 766 F. Supp. 2d at 599 (stating that a salaried employee required to work more hours with no change in pay may be subject to an adverse employment action because there was an effective pay cut). However, three hours of uncompensated overtime is not significant enough to alter Hwang's terms and conditions of employment. *See Formella*, 817 F.3d at 511 (finding that a loss of $7,000 of premium was sufficient to constitute an adverse employment action); *Thorn*, 766 F. Supp. 2d at 599 (stating that when a salaried employee was asked to work

10 percent more hours at the same pay, effectively reducing the hourly rate by more than 9 percent, there was a material difference in the terms and conditions of employment). Similarly, the July 7, 2017 incident in which Singleton issued a Letter of Warning to Hwang and charged him as "Absent With Out Leave," described as a "non-pay status," could only have affected Hwang's pay in a very limited way as he was absent for only 30 minutes of work. J.A. 270.

Even if these particular incidents could be construed to be adverse employment actions, the Court also finds that Hwang has not shown sufficient evidence that a similarly situated comparator outside his protected classes was treated differently under similar circumstances. Moreover, HHS has offered facially legitimate non-discriminatory reasons. On July 7, 2011, Singleton classified Hwang as Absent Without Leave based on his view that Hwang left before the end of his work day without notifying anyone, in violation of NBS policy. On July 11, 2017, Singleton denied the request for overtime because it came after the extra work had begun, and by policy such requests must be submitted in advance. Perrone has asserted, and Hwang has not disputed, that regardless of when the meeting on February 13, 2018 was scheduled, he did not actually submit a request to alter his work schedule that day or to receive overtime that day. Where the defendant makes a showing of a legitimate, non-discriminatory reason for the non-selection, the burden then shifts back to the plaintiff to show that the stated reason was a "pretext for discrimination." *Hill*, 354 F.3d at 285. Even if a plaintiff has established a *prima facie* case and presented evidence that the asserted justification for the action was false, the evidence may still be insufficient to support a finding of liability. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148 (2000). In the end, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.* at 143 (quoting *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

Here, as discussed below, there is some evidence that HHS's explanations for these actions were false and that they were actually motivated by an intent to retaliate against Hwang for engaging in EEO activity. *See infra* part III. However, Hwang has not presented sufficient evidence to show that these actions were actually motivated by an intent to discriminate based on race, sex, or age. Hwang has provided no evidence to show that Perrone or Singleton had any discriminatory animus against him or others based on sex or age. As for race, the only additional evidence arguably related to discriminatory intent is Hwang's assertion that Perrone expected him to conform to a "model minority" stereotype and to be compliant, Ferrer's statement that she believed Perrone was discriminating against Hwang based on race and national origin, and Ferrer's testimony that Perrone had previously stated that she could not understand Hwang when he spoke. J.A. 293. Generally, subjective beliefs about discriminatory intent are not alone sufficient to support an inference of discrimination. *See Williams v. Cerberonics, Inc.*, 871 F.2d 452, 459 (4th Cir. 1989) (holding that a plaintiff fails to demonstrate pretext where the only evidence of discriminatory intent is the plaintiff's own assertions and subjective beliefs). Although a criticism about an employee's English could relate to discriminatory intent under certain circumstances, such as if the employee was actually a native speaker, Hwang has acknowledged in his testimony that he is not a native English speaker and his English could be "better." J.A. 21. Finally, though Hwang has asserted that Asian American employees have filed EEO complaints against Perrone, including at least one successful one in 2012, he has not provided specific evidence showing actual discrimination in those instances that could then support an inference of discrimination here. So the evidence of Perrone's discriminatory intent is at best very limited.

Significantly, the July 7 and July 11 incidents were perpetrated by Singleton, against whom there is no allegation or evidence of specific statements or conduct exhibiting discriminatory

21

intent. *See Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 300 (4th Cir. 2010) (stating that in a Title VII case, "[i]t is the decision maker's intent that remains crucial"). As for the February 13, 2018 incident, Hwang has not provided evidence that he actually asked Perrone to allow him to change his schedule or to receive overtime pay for attending the meeting after his regular work day. Under these circumstances, the Court concludes that there is insufficient evidence to support a finding that these incidents were motivated by race discrimination. The Court will therefore grant the Motion as to Hwang's claims of discrimination under Title VII and the ADEA.

## III.    Retaliation

In Count 3, Hwang alleges retaliation in violation of Title VII. Title VII's anti-retaliation provision forbids actions by an employer that "discriminate against" an employee because that employee has "opposed" a practice that Title VII forbids or has "made a charge, testified, assisted, or participated in" a Title VII "investigation, proceeding, or hearing." 42 U.S.C. § 2000e-3(a). A retaliation claim may be established through direct or indirect evidence of retaliatory animus or through the burden-shifting framework analogous to the discrimination framework set forth in *McDonnell Douglas. See Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015).

Direct evidence consists of conduct or statements that both (1) "reflect directly" the alleged discriminatory or retaliatory attitude; and (2) "bear directly on the contested employment decision." *Laing v. Fed. Exp. Corp.*, 703 F.3d 713, 717 (4th Cir. 2013) (internal citation omitted). Under either approach, the plaintiff must show that the adverse action would not have occurred in the absence of the employer's retaliatory animus, such that retaliation was the "real reason" for the action. *Foster*, 787 F.3d at 251–52. As discussed below, Hwang has identified direct evidence of retaliatory motive but also proceeds under the *McDonnell Douglas* analysis, under which:

> [A] plaintiff bears the initial burden of establishing a prima facie case of retaliation. Once this burden is carried, the burden shifts to the defendant, who is obliged to articulate a legitimate, non-retaliatory justification for the adverse employment action. If the defendant carries this burden, the onus is on the plaintiff to then demonstrate that the non-retaliatory reason advanced by the defendant is a mere pretext.

*EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005) (internal citations omitted);

*cf. McDonnell Douglas*, 411 U.S. at 802–04.

To establish a *prima facie* case of retaliation, a plaintiff must present facts that establish that (1) the plaintiff engaged in a protected activity; (2) the employer took a materially adverse action against the plaintiff; and (3) there was a causal link between the two events. *Boyer–Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015). There is no dispute that Hwang engaged in protected activity. Specifically, in January or February 2017, Hwang provided an affidavit in support of a co-worker's EEO complaint; on March 15, 2017, he initiated contact with the EEO office about his own complaints of discrimination; and on April 27, 2017, he filed his own formal EEO complaint.

For a retaliation claim, a "materially adverse" action is one which "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). It need not meet the more stringent definition of an "adverse employment action" required for a discrimination claim. *See id.* at 64 (holding that "the antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment"). Here, only actions taken after Hwang's first protected activity, which occurred in January or February of 2017, could potentially be deemed retaliatory. *See Baqir v. Principi*, 434 F.3d 733, 748 (4th Cir. 2006) (holding that an employer must have known about an employee's protected activity in order to have engaged in unlawful retaliation); *see also Buchhagen v. ICF Int'l, Inc.*, 650 F. App'x 824, 830 (4th Cir.

23

2016) (holding that "an employment action cannot be adverse when the action was contemplated before the protected activity occurred").

Here, Hwang has identified several actions which, while not altering the terms and conditions of employment such that they would be adverse employment actions that could support a discrimination claim, meet the lower standard for a materially adverse action that could support a retaliation claim. For example, the Court finds that the denial of the opportunity for Hwang to go on a detail to NIH Budget, the issuance of a Letter of Warning to Hwang arising from the July 7, 2017 incident during which he left work early for a medical reason, and the denial of overtime pay for July 11, 2017 would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N.*, 548 U.S. at 68.

As for causation, in this instance, while HHS has argued that there are legitimate, non-retaliatory reasons for each adverse action, Hwang has presented direct evidence of a retaliatory motive. In her deposition, Ferrer testified that Perrone told her in early 2017 that she was aware that Hwang and others had engaged in protected activity, and that in 2018, Perrone directly told her on approximately five occasions that she intended to retaliate against them for their EEO activity. For example, she told Ferrer that she was going to "fight back" and "make it difficult for them" so they would "hopefully . . . leave" NBS and find other employment. J.A. 819. Ferrer also testified that Perrone wanted to make sure that Hwang and Vedula were not comfortable at NBS. Several of these statements were made in the presence of Singleton or in a conversation with Singleton, who never expressed any opposition to Perrone's plans to retaliate. Consistent with these statements, Perrone imposed aggressive deadlines and increased the scope of assignments given to Hwang and Vedula. Perrone also directed Ferrer to give Hwang and Vedula tasks with

unrealistic deadlines to set him up to fail, and Perrone then verbally berated them in front of others for not meeting her directives.

Although this direct evidence that Perrone deliberately retaliated against Hwang for filing an EEO complaint derives from 2018, it supports a reasonable inference that Perrone's retaliatory animus existed from the time the EEO complaints were filed and motivated the earlier materially adverse actions in 2017. Thus, considering the facts in the light most favorable to Hwang, the Court finds that there is sufficient evidence to create a genuine issue of material fact whether the true reason for those actions was retaliation for Hwang's protected activity. *See Lettieri*, 478 F.3d at 651 (holding that the district court erred in granting summary judgment where there was sufficient evidence to show that the plaintiff was the victim of illegal retaliation). The Court will therefore deny HHS's Motion as to the retaliation claim. The Court need not address Hwang's alternative theory that HHS engaged in *per se* retaliation when Perrone informed Ferrer of Hwang's EEO complaint and thus failed to take proper precautions to secure the confidentiality of EEO information.

## IV.   Hostile Work Environment

Hwang also alleges a claim of a hostile work environment in violation of Title VII. A hostile work environment exists when "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Boyer-Liberto*, 786 F.3d at 277. To prevail on a hostile work environment claim, a plaintiff must show that (1) the plaintiff experienced unwelcome harassment; (2) the harassment was based on the plaintiff's membership in a protected class or prior protected activity; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and to create an abusive atmosphere; and (4) there

is some basis for imposing liability on the employer. *Pueschel v. Peters*, 577 F.3d 558, 565 (4th Cir. 2009). "In measuring whether the offensive conduct is severe or pervasive enough to warrant relief, we must look at the totality of the circumstances, including:  the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Mosby-Grant v. City of Hagerstown*, 630 F.3d 326, 335 (4th Cir. 2010) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998)).

Here, there can be no serious dispute that Hwang was subjected to unwelcome conduct, and where the conduct was led by Perrone, Hwang's immediate supervisor, and was in some instances conducted or condoned by Singleton, his second-level supervisor, it can be fairly imputed to the employer. *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998). HHS primarily argues that the combination of the incidents and actions discussed above are not sufficiently severe and pervasive to created a hostile work environment. These incidents include Hwang's reduced PMAP rating in February 2017; the additional requirements in his 2017 PMAP; the questioning of his whereabouts and work status in April 2017; Perrone's denial of his request to access the FBIS system in April 2017; the denial of his sick leave and overtime requests and the issuance of a Letter of Warning in July 2017; the administrative issues related to his extended sick leave in September and October 2017; Perrone's improper request that he use annual leave for a government closure on March 2, 2018; his assignment to the Risk 510 project and subsequent issues related to the project; his denial of a detail opportunity in March 2018; and his temporary inability to comment on his mid-year review in advance of his departure from NBS in August 2018. Based on Ferrer's testimony, the evidence also establishes that in 2018, Perrone either directly or through Ferrer set

unrealistic deadlines and broadened the scope of various projects in order to set Hwang up to fail, then berated him when he was unable to meet the stated expectations.

Many of these incidents fall within the category of standard activities of a supervisor, such as approving or disapproving overtime and sick leave or issuing performance evaluations, rather than overtly insulting or hostile comments or actions. HHS also argues that many had legitimate explanations. However, these incidents must be viewed in the context of Ferrer's testimony, in which she described a concerted effort by Perrone, implicitly assented to by Singleton, to "fight back" and "make it difficult" for Hwang and other employees who filed EEO complaints, with the intention of causing them to leave NBS. J.A. 819. With this testimony, a reasonable jury could fairly conclude that a communication questioning whether Hwang was actually working, or the denial of an overtime request because it was made 40 minutes after the extra work started rather than before, were not fair supervision and application of personnel rules, but deliberate, hostile harassment. Likewise, with this context, other incidents such as Perrone's harsh emails and berating of Hwang after deliberately giving him unreasonable deadlines for broad assignments, which HHS may characterize as legitimate supervisory criticism of unsatisfactory work, could instead be fairly viewed as intentional efforts to directly insult and humiliate Hwang without actual justification.

The impact of this campaign was clear, as Hwang reported that he "enjoyed the work for many years" and was "pretty happy at work" before 2017, but then everything started to change and he found himself having to "fight everything." J.A. 4, 19. During his final almost two "turbulent" years at NBS, Hwang stated that his health deteriorated, his blood pressure went up, he "could not sleep," he "was constantly on alert" and he was told by his doctor that he suffered from Post-Traumatic Stress Disorder, which required him to take an extended medical leave. J.A.

31. Hwang sought treatment from a psychiatrist for three and a half months and began taking medications to help him relax because he "was so depressed." J.A. 32. The conduct ultimately caused Hwang to feel that he had to leave the job and take a different one at an agency which he considered to have a less compelling mission and which required a significantly longer commute. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993) (holding that part of the analysis of a hostile work environment is whether the actions unreasonably interfered with an employee's work performance). Considered together, these incidents, while not necessarily severe on an individual basis, constituted a pervasive pattern lasting over a year of continual roadblocks to Hwang's efforts to perform his job that was sufficiently hostile and abusive as to be debilitating to its target. The Court therefore finds that a reasonable jury could find that this course of conduct amounted to a hostile work environment. *See Faragher*, 524 U.S. at 787 (requiring that the environment be one that "a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so").

On the final element, that the hostile work environment was motivated by discrimination or retaliation, the Court finds that based on the direct evidence of Perrone's retaliatory intent discussed above, Hwang has provided sufficient evidence to establish that the allegedly hostile work environment was motivated by retaliation for his filing of EEO complaints. *See supra* part III. With such evidence a reasonable jury could conclude that the full course of conduct against Hwang post-dating his initial EEO contact in January or February 2017 on behalf of a co-worker, even incidents predating Perrone's explicit disclosure to Ferrer of her retaliatory intent, constituted a hostile work environment motivated by that retaliatory animus. *See Gowski v. Peake*, 682 F.3d 1299, 1313 (11th Cir. 2012) (finding sufficient evidence to establish a retaliatory hostile work environment where there was evidence that the perpetrator's retaliatory intent was "well known").

However, based on the Court's prior conclusion that there is insufficient evidence to support a finding of race, sex, or age discrimination, the Court finds for similar reasons that the evidence will not support a finding that the hostile work environment was motivated by discriminatory animus on any of these bases. Thus, the Court will allow the hostile work environment to remain only to the extent it is based on retaliation.

## CONCLUSION

For the foregoing reasons, HHS's Motion for Summary Judgment will be GRANTED IN PART and DENIED IN PART. The Motion will be granted as to the claims of race, sex, and age discrimination and the claim of a discriminatory hostile work environment. The Motion will be denied as to the claims of retaliation and a retaliatory hostile work environment. A separate Order shall issue.

Date:  August 19, 2022

THEODORE D. CHUANG
United States District Judge